UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
RONALD HUDSON,                                          :

               Petitioner,                       :
                                         12 Civ. 9149 (PAC) (GWG)
                                 :
               -v.-                            REPORT AND RECOMMENDATION
                                 :
ADA PEREZ,                                              :

               Respondent.                       :
-------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

      Ronald Hudson, currently an inmate at Downstate Correctional Facility in Fishkill, New

York, brings this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Hudson was

convicted of criminal sale of a controlled substance in the first degree under New York Penal

Law § 220.43(1), following a jury trial in New York State Supreme Court in May 2009.  After

trial, Hudson was sentenced to fifteen years in prison and five years of post-release supervision.

For the following reasons, Hudson's petition should be denied.

I.        <u>BACKGROUND</u>

      On June 16, 2008, a grand jury voted a 16-count indictment against Hudson and co-

defendants Robert St. Hilaire, Bernard Washington, and Kirschel Butler.  <u>See</u> Indictment

(annexed as part of Ex. B to Answer in Opposition to the Petition for a Writ of Habeas Corpus,

filed Apr. 4, 2013 (Docket # 9) ("Gov. Answer")), A-18–25.  Hudson was named in two counts

of this indictment: Count Three charged Hudson and St. Hilaire with criminal sale of a

controlled substance in the first degree on April 10, 2008, and Count Eleven — later dismissed

after verdict — charged Hudson with criminal sale of a controlled substance in the second

degree on April 15, 2008.  <u>Id.</u> at A-19–23.  This indictment followed a long-term investigative

1

operation by law enforcement officers of drug dealing at 1238 St. Marks Avenue in Brooklyn.

See State Court Transcript, filed Apr. 3, 2013 (Docket # 10) ("Tr."), at 343–49 [349–54].[1]

    A.    <u>Trial and Sentencing</u>

        1.    <u>Investigation Prior to the April 10, 2008 Sale</u>

At trial, several police officers testified about their observations during this investigation.

Detective Daniel Murphy testified that he was originally investigating an individual named Ivan

Carter, who introduced him to St. Hilaire in January 2008 when Carter could not supply the

amount of cocaine the officers sought. (Murphy: Tr. 338–40). Between January 15 and March

27, 2008, various undercover officers involved in the operation made seven drug purchases from

St. Hilaire. (Murphy: Tr. 340).

Undercover Officer Shield Number 2454 ("UC 2454") testified that he and his partner,

Undercover Officer Shield Number 7972 ("UC 7972"), engaged in multiple drug sales with St.

Hilaire in March, April, and May 2008. (UC 2454: Tr. 32–79). On March 20, 2008, UC 7972

called St. Hilaire's cell phone and ordered crack cocaine. (UC 2454: Tr. 36–38). The two

officers then drove to 1238 St. Marks Avenue and double-parked in front of the building. (UC

2454: Tr. 38). UC 7972 called St. Hilaire to tell him he had arrived and entered the building, at

which time St. Hilaire emerged from a white Dodge Charger and walked to a dark BMW parked

in front of UC 2454's vehicle. (UC 2454: Tr. 38–39). St. Hilaire reached into the front

passenger window of the BMW and then entered the building. (UC 2454: Tr. 39). UC 7972

then exited the building, returned to the car, and indicated to UC 2454 that he had purchased the

---

[1] Because the page numbers that appear in the transcript are often illegible, non-existent or not consecutive, this decision cites to the transcript pages based on the page number that would have been assigned to that page had each transcript page been numbered consecutively. Where a page number actually appears in the transcript, that page number appears in brackets.

drugs.  (Id.).  Following the sale, the officers observed St. Hilaire returning to the BMW.  (UC 2454: Tr. 41).

On March 27, 2008, the officers returned to 1238 St. Mark's Avenue.  (UC 2454: Tr. 42).  Before they arrived, UC 7972 called St. Hilaire, ordered 70 grams of crack cocaine, and informed him that his "fam" would be picking up the drugs, which was a reference to UC 2454.  (UC 2454: Tr. 42–43, 132–33 [136–37]).  When they got to 1238 St. Marks Avenue, UC 2454 called St. Hilaire and informed him that he was waiting in front of the building.  (UC 2454: Tr. 43).  St. Hilaire was angry that UC 2454 had not given him advance notice and told UC 2454 he would have to wait.  (UC 2454: Tr. 45).  After more than 30 minutes, St. Hilaire appeared at the door of UC 2454's car, telling him to go inside the building.  (UC 2454: Tr. 46–48).  UC 2454 then got out of the car while telling St. Hilaire that he "scared the shit out of" him.  (UC 2454: Tr. 48).  St. Hilaire laughed and then approached the same black BMW.  (Id.).  UC 2454 entered the building and St. Hilaire came in a few minutes later.  (Id.).  St. Hilaire asked UC 2454 for $60 up front and, once UC 2454 gave him that money, St. Hilaire handed him a clear plastic bag with a "white rocky substance" inside.  (UC 2454: Tr. 48–49).  UC 2454 then gave St. Hilaire $2400 in cash and left the building.  (UC 2454: Tr. 49–50).

Detective Edward Hartrick testified that he observed and videotaped this exchange from a van across the street from the building, as well as the similar exchanges that took place on April 10 and April 15, 2008.  (Hartrick: 204–05, 210–37 [215–32]).  On March 27, 2008, he saw a black BMW pull up behind the undercover officers' vehicle while the officers waited inside the vehicle.  (Hartrick: Tr. 211–13 [215–17], 241).  He observed St. Hilaire reaching into the black BMW both before and after UC 2454 exited the building.  (Hartrick: Tr. 241–42; Murphy: Tr. 521–522 [527–28]).

3

2.    <u>April 10, 2008 Sale</u>

On April 10, 2008, the officers held a tactical plan meeting and decided to follow any vehicle that St. Hilaire approached outside 1238 St. Marks Avenue, as they believed such a vehicle would be the source of the drugs St. Hilaire was selling.  (Murphy: Tr. 353–54 [359–60], 523 [528]; UC 2454: Tr. 60–61 [62–63]).  UC 7972 arranged by cell phone to buy 70 grams of cocaine from St. Hilaire, drove to 1238 St. Marks Avenue with UC 2454, and told St. Hilaire he had arrived.  (UC 2454: Tr. 53–56).  St. Hilaire told him to wait outside, and eventually instructed him to enter the building.  (UC 2454: Tr. 63–64 [65–66]).  At 5:30 p.m., a gray Mercedes Benz with Pennsylvania plates pulled up behind the officers' car.  (UC 2454: Tr. 65–67 [67–69]; Hartrick: Tr. 221–23 [225–27]).  Hudson was later identified as the driver of the Mercedes.  (Soler: Tr. 280; Murphy: Tr. 381).  St. Hilaire pulled up in an Altima shortly thereafter and double-parked next to the Mercedes.  (UC 2454: Tr. 65 [67], 154–55).  St. Hilaire then exited the car, opened the front passenger door of the Mercedes, and leaned inside the car briefly.  (Hartrick: Tr. 221–25 [225–29]; Murphy 371 [377], 427 ).  He then went inside the building, where he handed UC 2454 a plastic bag with 70 grams of crack cocaine.  (UC 2454: Tr. 65 [67]).  UC 2454 weighed this amount and then paid St. Hilaire.  (<u>Id.</u>).  UC 2454 exited the building and informed his team that he had made a positive buy.  (UC 2454: Tr. 66 [68]).  He told them to watch St. Hilaire because he would likely give the sale proceeds to the supplier. (<u>Id.</u>).

Shortly thereafter, St. Hilaire left the building with his hand in his pocket, walked straight to the passenger side of the Mercedes, and briefly leaned into the car.  (Hartrick: Tr. 247).  The Mercedes began to drive away shortly thereafter.  (Hartrick: Tr. 223, 247 [254]).  Detective Agapito Soler testified that members of the field team followed the Mercedes and at one point

4

observed the Mercedes back up a one-way street.  (Soler: Tr. 277 [283]).  Detectives stopped the

Mercedes at the corner of President Street and Rochester Avenue.  (Soler: Tr. 277–78 [283–84]).

When the officers approached the car, Hudson was looking back and forth quickly and his hands

were shaking.  (Soler: Tr. 280).  He did not have a driver's license, but did have a New York

State identification card and the car's registration.  (Soler: Tr. 280–81).  The car was registered

to "Sharon N. Penelope Nedd," who Hudson said was his girlfriend.  (Murphy: Tr. 365 [371];

Soler: Tr. 281 [287]).  He called her, and she came to the scene and identified herself as

Penelope Nedd.  (Soler: Tr. 281–83 [287–89]).  Hudson was given a summons for driving

without a license.  (Soler: Tr. 281–84 [287–90]).

3.    April 15, 2008 Sale

On April 15, 2008, UC 2454 arranged another sale with St. Hilaire at 1238 St. Marks

Avenue.  (UC 2454: Tr. 70–72 [72–74]).  St. Hilaire instructed UC 2454 to wait in his car when

he first arrived, then told him to come into the building where his cousin would complete the

transaction.  (UC 2454: Tr. 72 [74]).  Butler was waiting for UC 2454 inside and told UC 2454

to wait while Butler exited and returned a few minutes later.  (UC 2454: Tr. 72–75 [74–77]).  At

that time, Butler handed UC 2454 his cell phone, told him to speak to St. Hilaire, and then stood

in front of the building looking up and down the street.  (UC 2454: Tr. 75).  At 6:33 p.m., the

same Mercedes as the one driven by Hudson on April 10 drove up and parked in front of the

building.  (Hartrick: Tr. 251 [257]).  Butler leaned into the car and then ran to the building.

(Hartrick: 251–52 [257–58]).  Once inside, Butler went upstairs, and a few minutes later, St.

Hilaire came down and handed UC 2454 the drugs.  (UC 2454: Tr. 75–76 [77–78]).  UC 2454

gave him $1200 in prerecorded buy money.  (UC 2454: Tr. 76 [78]).  During the transaction, UC

2454 asked Butler his name, to which Butler replied, "Numbers."  (UC 2454: Tr. 76 [78]).

5

4.    Phones Recovered From Hudson and St. Hilaire

On June 4, 2008, the police arrested Hudson in the silver Mercedes.  (Murphy: Tr. 375

[381], 378 [384]).  They seized two cell phones from the front passenger car seat.  (Murphy: Tr.

381).  Detective Murphy searched the phones pursuant to a warrant.  (Murphy: Tr. 390).  The

phones were registered to an "Odell Ned" at "16 Untica [sic] Avenue."  (Id.; Lewis: Tr. 596).

Detective Murphy testified that he could not find such an individual or address after conducting

several computer checks.  (Murphy: Tr. 390–93).

An employee of Verizon Wireless testified about the records of these cell phones.

(Lewis: Tr. 593–602).  One of the phones was a prepaid cell phone with the number (912) 704-

9685.  (Lewis: Tr. 595–99; Murphy: Tr. 511).  Prior to May 9, 2008, the number used by that

cellphone was (912) 704-4719.  (Lewis: Tr. 594–602).  The number of the second phone was

(347) 598-0938.  (Murphy: Tr. 512).

Three cell phones were recovered from St. Hilaire at the time of his arrest on the same

date and were admitted into evidence.  (Murphy: Tr. 377–78 [383–84], 395).  Pursuant to search

warrants, Detective Murphy searched these phones and found several entries for an individual

named "Luck."  (Murphy: Tr. 395, 398–99).  Murphy had learned that Hudson went by this

nickname over the course of the investigation.  (Murphy: Tr. 518 [523]).  In one of St. Hilaire's

phones, "Luck" was listed in a contact list with the phone number (912) 704-9685 — the same

number of one of the phones recovered from the gray Mercedes.  (Murphy: Tr. 399).  In another

of St. Hilaire's phones, a second number for "Luck" in the contact list was (347) 598-0938 —

the same number as the other phone recovered from the gray Mercedes.  (Murphy: Tr. 511–13).

An expert in information technology for the City of New York who had analyzed the

telephone records testified that there were 21 calls between St. Hilaire and the (912) 704-4719

6

number on April 10, 2008, as well as nine calls between UC 2454 and St. Hilaire.  (Power: Tr. 636–37, 713–15).

On direct examination, Detective Murphy was asked whether he found a contact "for someone named Luck" in any of St. Hilaire's phones.  (Tr. 399).  He answered in the affirmative, and when asked what "Luck's" number was, he gave the -9685 number.  (Id.).  He was then asked if that was the number of the phone recovered from Hudson's Mercedes, and he said yes. (Id.).  On redirect, Murphy was given each of St. Hilaire's phones and asked to state aloud and write down on a piece of paper the number for "Luck" that appeared in each one.  (Murphy: 509–17 [519–22]).   Defense counsel objected when the prosecution sought to admit the piece of paper into evidence, but agreed that the objection could be overcome with a limiting instruction. (Tr. 515–17 [520–22]).  After the exhibit was admitted, the judge instructed,

> Jurors, let me instruct you about this exhibit.  This exhibit is given to you only to show on a piece of paper what was shown on the computer screen you saw.  It has no significance other than that.  It's up to you to draw your own conclusion what the significance is.  Again this is a copy written in the detective's hand of what you saw on the screen.  That's what this is.

(Tr. 517 [522]).

###### 5.   Testimony About a Hidden Trap

Murphy and Detective Ellen Friedman, an expert in the detection of hidden compartments and traps, testified that they searched the gray Mercedes pursuant to a search warrant.  (Friedman: Tr. 620 [625], 623–24 [628–29]; Murphy: Tr. 383–84).  Friedman found a hidden compartment on the back of the front passenger seat.  (Friedman: Tr. 624–26 [629–31]). She was unable to determine how the trap could be opened, and when she forced it open, it was empty.  (Friedman: Tr. 626 [631], 629–630 [634–35]).

6.     Testimony About the Course of the Investigation

After watching portions of the video surveillance evidence, Detective Murphy testified

that, following the March 27 exchange, the officers had planned to stop any car St. Hilaire

approached after a drug sale because they believed the individual in the car was providing the

drugs to St. Hilaire.  (Murphy: Tr. 351–54 [357–60]).  Defense counsel objected to the testimony

on the ground that Murphy was offering an impermissible opinion, but the trial judge ruled that

Murphy's statement was not being admitted for its truth but instead to explain the behavior of

the officers.  (Tr. 352–53 [358–59]).  On cross-examination, counsel asked Murphy whether on

January 15, 18, and 23 he had seen a Mercedes or whether he had had "any connection

whatsoever with Ronald Hudson," to which Murphy responded "no."  (Murphy: Tr. 404–06).

With respect to the April 15 transaction, counsel asked whether it was "[f]air to say also you

don't know where the narcotics from that purchase came from," to which Murphy answered

affirmatively.  (Murphy: Tr. 434).  On redirect, Murphy was asked what he thought was

happening in the March 27, 2008 videotape when St. Hilaire approached a black BMW, and the

court, over defense counsel's objection, allowed him to answer, ruling that defense counsel had

opened the door to this line of questioning and that the information was still not being offered for

the truth of the matter.  (Tr. 519–21 [524–26]).  The court also stated that it would give the jury a

limiting instruction. (Tr. 520–21 [525–26]).  Murphy testified that he believed St. Hilaire was

"putting the drug transactions into the car."  (Murphy: Tr. 522 [527]).  When asked about the

video of the April 10 transaction, which was shown to the jury, Murphy testified that he could

not see who was driving the Mercedes and saw no drugs or money, but that after watching the

video, he determined that they should investigate the driver of the Mercedes.  (Murphy: Tr.

523–27 [528–32]).  While testifying about the April 15, 2008 video, Murphy was asked by

defense counsel, "Is it fair to say you don't know what's really going on at this point?" (Tr. 581 [586]). Over the prosecutor's objection, Murphy replied, "In my professional opinion, yes. Factual, no." (Murphy: Tr. 581 [586]). At the end of his testimony, the trial court told the jury:

> Sometimes evidence is given to you for one purpose and not for another purpose. This is one of those times. The detective indicated narcotics were coming from the car on March 27, that he believed drugs were coming from the car on March 27. That was given to you not for the truth of that issue; that is something for you to decide. It was given to you to explain why the police were doing what they were doing while the investigation was proceeding and he was trying to explain to you the evidence that was given to you for the purpose of explaining why the police took the actions they did and not for the truth of the fact that, as he stated, narcotics came from the car on March 27.

(Tr. 591–92).

### 7.    Verdict, Dismissal of One Count, and Sentence

Hudson offered no evidence. On May 14, 2009, the jury convicted Hudson of both of the charged counts. (Tr. 812, 851–54 [856–59]). On June 30, 2009, the trial court dismissed the count for criminal sale of a controlled substance in the second degree, which related to the April 15 sale, on the ground that the evidence was legally insufficient to support a conviction. (Tr. 856, 858–61). The trial court then sentenced Hudson on the remaining count to a term of 15 years imprisonment and five years of post-release supervision. (Tr. 869).

### B.    Direct Appeal

On March 21, 2011, Hudson, represented by new counsel, filed an appeal to the Appellate Division, First Department. See Brief for Defendant-Appellant, dated Mar. 21, 2011 (annexed as Ex. A to Gov. Answer). In his brief, Hudson argued that 1) the trial court erred by admitting hearsay evidence from St. Hilaire's cell phone; 2) the trial court erred by allowing a police officer to speculate about actions depicted in the videotapes; 3) the trial court erred in allowing a prosecution witness to testify by means of demonstrative aids; 4) the jury's verdict

9

was against the weight of the evidence because the prosecution failed to prove that Hudson had

engaged in the sale of narcotics; and 5) Hudson was deprived of his rights to due process and a

fair trial because of the prosecutor's entreaty in his summation to the jury to "do the right thing."

Brief for Defendant-Appellant at 18–69.

On December 6, 2011, the Appellate Division affirmed Hudson's conviction. People v.

Hudson, 90 A.D.3d 437 (1st Dep't 2011).  In its decision, the court found that the evidence of

Hudson's guilt was legally sufficient to support a conviction, noting that "[t]here was a chain of

circumstantial evidence, including defendant's behavior at the time of the drug transaction, that

made no sense unless defendant was a participant."  Id. at 438.  The court also held that it was

not error for the trial court to allow proof that St. Hilaire's cell phone had a contact listing for

Hudson's nickname that matched the phone number of a cell phone recovered from Hudson

because "[t]his evidence was not received for its truth, but even if received for its truth, it was

admissible as a statement by a coconspirator" and "[i]n any event, the contact entry was not

prejudicial, because it was merely cumulative to other evidence showing a pattern of calls

between the codefendant's phone and a phone that was sufficiently connected to defendant."  Id.

As for the testimony relating to the events shown in the videotape, the court held that it was

proper to allow this testimony because the detective "only explained his own state of mind and

how it was affected by the videotape.  This was relevant to explain the actions of the police in

stopping defendant's car several weeks later."  Id.  Hudson's objection relating to the exhibit

summarizing phone records was rejected because the court said that Hudson's "remaining

challenges to this evidence are unpreserved and [the court] decline[s] to review them in the

interest of justice."  Id.  In an "alternative holding," the court rejected these challenges "on the

merits."  Id.  The court held that Hudson's objection regarding the prosecutor's summation was

"unpreserved," but that if the court were to review the claim, it "would find no basis for reversal." Id. at 438–39.

On January 5, 2012, Hudson's counsel sought leave to appeal to the New York Court of Appeals, raising his claims about the videotape and cell phone evidence.  Letter from Herald Price Fahringer, Esq. to the Honorable Jonathan Lippman, dated Jan. 5, 2012 (annexed as Ex. E to Gov. Answer).  The government opposed this application, see Letter from Sheila O'Shea to the Honorable Jonathan Lipmman, dated Feb. 21, 2012 (annexed as Ex. G to Gov. Answer), and Hudson filed a reply to the government's opposition, see Letter from Herald Price Fahringer, Esq. to the Honorable Jonathan Lippman, dated Mar. 2, 2012 (annexed as Ex. H to Gov. Answer).  On July 6, 2012, Hudson's application for leave to appeal was denied.  People v. Hudson, 19 N.Y.3d 974 (2012).

     C.     The Instant Petition

Hudson, now appearing pro se, filed this petition on November 30, 2012.  Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody, dated Nov. 30, 2012 (Docket # 1) ("Pet."); Brief in Support of Petition for Writ of Habeas Corpus, dated Nov. 30, 2012 (annexed as part of Pet.) ("Pet. Brief").  The respondent filed papers opposing the petition on April 3, 2013.  See Gov. Answer; Respondent's Memorandum of Law in Opposition to the Petition for a Writ of Habeas Corpus (annexed as part of Gov. Answer) ("Opp. Brief"); State Court Transcript.  Hudson filed a reply on April 25, 2013.  Reply to Opposition for Petition for a Writ of Habeas Corpus, filed Apr. 25, 2013 (Docket # 11) ("Pet. Reply").

II.     LEGAL STANDARD FOR PETITIONS BROUGHT PURSUANT TO 28 U.S.C. § 2254

A petition for a writ of habeas corpus may not be granted with respect to any claim that

has been "adjudicated on the merits" in state court unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme
> Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the
> facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

For a claim to be "adjudicated on the merits" within the meaning of section 2254(d), it

must "finally resolv[e] the parties' claims, with res judicata effect," and it must be "based on the

substance of the claim advanced, rather than on a procedural, or other, ground." Sellan v.

Kuhlman, 261 F.3d 303, 311 (2d Cir. 2001) (citations omitted).  As long as "there is nothing in

its decision to indicate that the claims were decided on anything but substantive grounds," a state

court decision will be considered "adjudicated on the merits" even if it fails to mention the

federal claim and cites no relevant federal case law.  Aparicio v. Artuz, 269 F.3d 78, 94 (2d Cir.

2001); accord Harrington v. Richter, 131 S. Ct. 770, 784–85 (2011) ("When a federal claim has

been presented to a state court and the state court has denied relief, it may be presumed that the

state court adjudicated the claim on the merits in the absence of any indication or state-law

procedural principles to the contrary.") (citation omitted); see also id. at 784 (section 2254(d)

deference applies even "[w]here a state court's decision is unaccompanied by an explanation").

Moreover, a state court's "determination of a factual issue" is "presumed to be correct," and that

presumption may be rebutted only "by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

A state court decision is "contrary to" clearly established federal law only "if the state

court applies a rule that contradicts the governing law set forth" in Supreme Court precedent or

"if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives" at a different result.  Williams v. Taylor, 529 U.S. 362, 405–06 (2000).  Habeas relief is available under the "unreasonable application" clause only "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  Id. at 413.  A federal court may not grant relief "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."  Id. at 411.  Rather, the state court's application must have been unreasonable — a standard that is met only "where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with" Supreme Court precedent. Harrington, 131 S. Ct. at 786; accord id. ("[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable").  In other words, to demonstrate an "unreasonable" application of Supreme Court law, the habeas petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  Id. at 786–87.

The "determination of whether a court has unreasonably applied a legal standard depends in large measure on the specificity of the standard in question."  Brisco v. Ercole, 565 F.3d 80, 89 (2d Cir.), cert. denied, 558 U.S. 1063 (2009).  "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations" inasmuch as the application of a general standard to a specific case "can demand a substantial element of judgment." Yarborough v. Alvarado, 541 U.S. 652, 664 (2004); accord Brisco, 565 F.3d at 90 (court applying a "fact-dependent standard . . . to the facts of a specific case is . . . entitled to significant

13

'leeway' when [a habeas court] review[s] its decision for reasonableness") (quoting Yarborough, 541 U.S. at 664).

Only holdings of the Supreme Court are considered for purposes of determining "[c]learly established federal law." Rodriguez v. Miller, 537 F.3d 102, 106 (2d Cir.) (citation omitted), cert. denied, 552 U.S. 1262 (2008). Thus, "[n]o principle of constitutional law grounded solely in the holdings of the various courts of appeals or even in the dicta of the Supreme Court can provide the basis for habeas relief." Id. at 106–07 (citation omitted). Where there is "[n]o holding" from the Supreme Court on the question presented, Carey v. Musladin, 549 U.S. 70, 77 (2006), or where Supreme Court cases "give no clear answer" to the question presented in the petition, Wright v. Van Patten, 552 U.S. 120, 126 (2008) (per curiam), a state court's decision can be neither contrary to nor an unreasonable application of clearly established federal law. See Knowles v. Mirzayance, 556 U.S. 111, 122 (2009) ("[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court.") (citations and internal quotation marks omitted).

III.    DISCUSSION

In his petition, Hudson argues that 1) his conviction was not supported by sufficient evidence, Pet. at 6; Pet. Brief at 1–21; Pet. Reply at 3–8; 2) the trial court violated his 5th, 6th, and 14th Amendment rights by allowing a detective to narrate and offer an expert opinion on an "otherwise discernable video," Pet. at 7; Pet. Brief at 22–40; Pet. Reply at 9–13; and 3) the trial court violated his right to confrontation by allowing into evidence an exhibit reproducing information from St. Hilaire's cell phone, Pet. at 9; Pet. Brief at 41–51; Pet. Reply at 13–16. We address each of these claims in turn.

14

A.    Sufficiency of the Evidence

Hudson argues that

[t]he people's evidence adduced at trial failed to prove the mens rea and the
element of sell incorporated as essential in criminal sale of a controlled substance
in the first degree.  Video recordings failed to depict the exchange and audio
failed to render an agreement, both elements are essential to prove beyond a
reasonable doubt that the petitioner intentionally aided and abetted accomplice in
his criminal conduct.

Pet. at 6.  On appeal, the Appellate Division held that the verdict was supported by legally

sufficient evidence based on "a chain of circumstantial evidence, including defendant's behavior

at the time of the drug transaction, that made no sense unless defendant was a participant."

Hudson, 90 A.D.3d at 438.

The Due Process Clause of the Fourteenth Amendment prohibits a criminal conviction

"except upon proof beyond a reasonable doubt of every fact necessary to constitute the

crime . . . ."  In re Winship, 397 U.S. 358, 364 (1970).  A court reviewing a sufficiency of the

evidence claim must determine "whether, after viewing the evidence in the light most favorable

to the prosecution, any rational trier of fact could have found the essential elements of the crime

beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in

original) (citation omitted).  To prevail, the petitioner must show that "upon the record evidence

adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable

doubt."  Id. at 324; accord Ponnapula v. Spitzer, 297 F.3d 172, 179 (2d Cir. 2002).

In conducting this review, "assessments of the weight of the evidence or the credibility of

witnesses are for the jury," and thus a habeas court will "defer to the jury's assessments of both

of these issues."  Maldonado v. Scully, 86 F.3d 32, 35 (2d Cir. 1996) (citing cases).  "[A]ll

possible inferences that may be drawn from the evidence must be construed in the prosecution's

favor." Id. (citing cases).  Where the record supports competing inferences, the habeas court

must "'presume — even if it does not affirmatively appear in the record — that the trier of fact

resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'"

Wright v. West, 505 U.S. 277, 296–97 (1992) (quoting Jackson, 443 U.S. at 326).  A habeas

petitioner challenging the sufficiency of the evidence underlying his conviction, therefore, bears

a "very heavy burden."  Knapp v. Leonardo, 46 F.3d 170, 178 (2d Cir.) (internal quotation marks

and citations omitted), cert. denied, 515 U.S. 1136 (1995).

    In considering the sufficiency of the evidence in support of a state conviction, a federal

habeas court "'must look to state law to determine the elements of the crime.'"  Fama v. Comm'r

of Corr. Servs., 235 F.3d 804, 811 (2d Cir. 2000) (quoting Quartararo v. Hanslmaier, 186 F.3d

91, 97 (2d Cir. 1999), cert. denied, 528 U.S. 1170 (2000)).  Under New York law, "[a] person is

guilty of criminal sale of a controlled substance in the first degree when he knowingly and

unlawfully sells . . . one or more preparations, compounds, mixtures or substances containing a

narcotic drug and the preparations, compounds, mixtures or substances are of an aggregate

weight of two ounces or more . . . ."  N.Y. Penal Law 220.43(1).   In addition, a person may be

found guilty of a crime as an accessory if he "intentionally aids" a person in engaging in the

criminal conduct.  N.Y. Penal Law § 20.00.

    Hudson argues that the evidence was insufficient to convict him of criminal sale of a

controlled substance in the first degree because of the lack of direct evidence connecting him to

the drug sales with which St. Hilaire was involved.  Pet. Brief at 1–22.  While it is true that there

was no direct evidence that connected Hudson to these drug sales, there was ample — indeed,

overwhelming — circumstantial evidence showing that he intentionally aided St. Hilaire in the

sale.  It is well settled that crimes "may be proven entirely by circumstantial evidence."  United

16

States v. Suref, 15 F.3d 225, 228 (2d Cir. 1994) ("So long as, from inferences reasonably drawn, the jury could fairly have found beyond a reasonable doubt that the defendant engaged in the charged criminal conduct, a conviction based on circumstantial evidence must be sustained."). A rational jury could have found that the testimony of the officers, the videotapes, and the cell phone records connected Hudson to the April 10, 2008 sale beyond any reasonable doubt.  There was uncontroverted evidence that Hudson was present during the sale that day; that St. Hilaire was not prepared to sell drugs to the undercover officer until Hudson actually arrived at the scene in the Mercedes; and that when Hudson arrived, St. Hilaire went to Hudson's car and then provided the undercover officer with drugs.  Phone records also corroborated 21 calls between St. Hilaire and Hudson on April 10, including calls at the time the sale was taking place.  Indeed, the video taken by the police showed Hudson talking on his cellphone from the Mercedes at the scene of the drug transaction at the precise time that phone records showed a call between St. Hilaire and Hudson.  See Brief for Respondent, dated September 2011 (annexed as Ex. C to Gov. Answer), at 7, 21.

Furthermore, a rational jury could have considered the testimony regarding Hudson's behavior following the drug sale, including his attempt to evade police and the fact that he carried multiple cell phones, as evidence of guilt.  See, e.g., People v. Garcia, 160 Misc.2d 844 (Cnty. Ct. 1994) (circumstantial evidence, including nervous behavior, legally sufficient for grand jury to find that defendant had knowledge of weight of drugs in car).  Finally, there was testimony about the hidden compartment in Hudson's car, whose use was corroborated by the fact that St. Hilaire reached into the Mercedes prior to each sale of cocaine to the undercover officers.  Taking all these factors into consideration, "the combination of many small pieces of valid evidence — each of which [was] established more probably than not was adequate, in sum,

17

to establish the elements of each crime beyond a reasonable doubt." Einaugler v. Supreme Ct. of State of N.Y., 109 F.3d 836, 840 (2d Cir. 1997) (alteration in original) (internal citation and quotation marks omitted).

      B.     Admission of Detective Murphy's Testimony About Videotapes

      Hudson argues that the state court "abused its discretion by allowing detective to narrate and bolster otherwise discernable video evidence and to offer professional opinion on the ultimate question: thus depriving petitioner of his rights to due process and a fair trial afforded by the U.S. Const: Amend. 5th, 6th, and 14th." Pet. Brief at 22.  He asserts that Murphy's testimony was improper because the videotape was self-explanatory and did not need explanation, that the testimony improperly invaded the province of the jury, and that Murphy unlawfully offered expert testimony expressing a legal conclusion.  Pet. Brief at 23–25, 28–30, 36, 39.  Respondents argue that the Appellate Division's determination that the testimony was introduced only to explain the state of mind of the detective and relevant to explain the actions of the police was not contrary to or an unreasonable application of Supreme Court law.  Opp. Brief at 28.[2]

      Because a petitioner must show that he is "in custody in violation of the Constitution or laws or treaties of the United States," 28 U.S.C. § 2254(a), "'federal habeas corpus relief does not lie for errors of state law,'" Estelle v. McGuire, 502 U.S. 62, 67 (1991) (quoting Lewis v. Jeffers, 497 U.S. 764, 780, (1990)).  Nonetheless, the Second Circuit has instructed that a court must "inquire into possible state evidentiary law errors at the trial level in order to ascertain

---

     [2]  Respondents argue that Hudson has not exhausted part of this claim as required by 28 U.S.C. § 2254(b)(1)(A).  See Opp. Brief at 17.  We elect not to reach this argument, however, because Hudson's claim must be rejected on the merits in any event.  See 28 U.S.C. § 2254(b)(2).

whether the appellate division acted within the limits of what is objectively reasonable in finding no constitutional defect existed . . . ."  Jones v. Stinson, 229 F.3d 112, 120 (2d Cir. 2009).  Even if an erroneous evidentiary ruling is found, however, this does not "automatically rise to the level of constitutional error sufficient to warrant issuance of a writ of habeas corpus."  Taylor v. Curry, 708 F.2d 886, 891 (2d Cir.), cert. denied, 464 U.S. 1000 (1983).  Rather, an erroneous ruling rises to a federal constitutional violation "only where petitioner can show that the error deprived her of a fundamentally fair trial."  708 F.2d at 891 (emphases omitted); accord Collins v. Scully, 755 F.2d 16, 18 (2d Cir. 1985); Crawford v. Artuz, 165 F. Supp. 2d 627, 635 (S.D.N.Y. 2001).   The erroneous admission of evidence constitutes a deprivation of due process under the Fourteenth Amendment only if "the erroneously admitted evidence, viewed objectively in light of the entire record before the jury, was sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it."  Collins, 755 F.2d at 19.  In other words, the evidence must have been "'crucial, critical, [and] highly significant.'"  Id. (quoting Nettles v. Wainwright, 677 F.2d 410, 414–15 (5th Cir. 1982)).  Thus, to obtain habeas relief based on an evidentiary ruling, a petitioner "must demonstrate first that the [trial court's evidentiary] ruling was erroneous and, second, that the erroneous ruling 'so infected the proceedings as to have rendered the trial fundamentally unfair.'"  Montalvo v. Newton, 2001 WL 1399527, at *2 (S.D.N.Y. Mar. 23, 2001) (quoting Alvarez v. Scully, 833 F. Supp. 1000, 1005 (S.D.N.Y.1993)).

Under New York law, testimony providing background information necessary to explain the actions of police officers is admissible.  See People v. Gregory, 78 A.D.3d 1246, 1246 (3d Dep't 2010) (hearsay statement admissible if it is admitted not for its truth but for the narrow purpose of explaining an officer's actions and the sequence of events in an investigation, and the

testimony is accompanied by an appropriate limiting instruction); People v. Rasako, 78 A.D.3d 498, 498 (1st Dep't 2010) (testimony about defendant's suspicious behavior admissible because it "provided necessary background information that . . . explained why the officer focused his attention on defendant"); People v. Givhan, 78 A.D.3d 730, 731 (2d Dep't 2010) (officer's testimony about anonymous tip admissible to provide background information as to why the officer approached the defendant); People v. Carney, 18 A.D.3d 242, 243 (1st Dep't 2005) (911 call by nontestifying declarant admitted to explain officers' investigatory steps).

Here, Detective Murphy's testimony consisted of his interpretation of the events depicted in the video and the impact those events had on his actions. The testimony explained why Murphy and the other officers focused their attention on Hudson. Hudson complains that Detective Murphy used the term "professional opinion." Pet. Br. at 23, 26–30. But Murphy used that term in the context of admitting that, with respect to a portion of the April 15 video, he did not "know what's really going on at this point." (Tr. 581.) Moreover, the statement was in response to a question by defense counsel on cross-examination. The trial court ultimately dismissed the count based on the April 15 sale for other reasons anyway. Notably, Murphy made clear that he could not see what was occurring during all the transactions and that the videos never revealed a visible drug sale. Taking Murphy's testimony in its entirety, the jury would not have understood him to be offering an improper opinion about the events depicted in the video. Finally, the trial court gave the jury appropriate limiting instructions, and a reviewing court is entitled to presume that the jury followed such instructions. CSX Transp., Inc. v. Hensley, 556 U.S. 838, 841 (2009); United States v. Whitten, 610 F.3d 168, 191 (2d Cir. 2010).

In sum, because the evidence was not offered for its truth but to explain the witness's actions, and a proper limiting instruction was given, there was no error of state law and certainly

20

no violation of "fundamental fairness." Moreover if, as Hudson argues, the events Murphy

described were evident from the video itself, the testimony was not "crucial, critical, [or] highly

significant." Collins, 755 F.2d at 19 (internal citation and quotation marks omitted).

      C.      Cell Phone Address Book Entry

Hudson argues that the trial court "abused its discretion by admitting into evidence

highly prejudicial hearsay testimony, that the name 'Luck' itemized in alleged accomplice cell

phone that alone provided the evidentiary link to accused act." Pet. Brief at 41 (capitalizations

omitted). Because "the word luck can't be cross-examined," Pet. Brief at 41, Hudson asserts that

his right to confrontation was violated, id. at 41–42. Respondents argue that 1) the cell phone

entries were not hearsay because they were not offered for the truth of any matter; 2) the contact

information was admissible as a statement by a co-conspirator; 3) if considered a statement by a

co-conspirator, the information was not testimonial and thus not subject to the Confrontation

Clause; and 4) if considered a testimonial statement, any error was harmless. Opp. Brief at

39–45.

The Court questions whether the word "Luck" with an associated entry as a cell phone

entry constitutes a "statement" for purposes of the hearsay rule at all. But however it may be

characterized, the entry — either in its original form or as copied by Detective Murphy — was

not being admitted for its truth. That is, the entries were not used to prove that Ronald Hudson

was actually assigned that telephone number or that St. Hilaire ever made a statement to that

effect. Instead, they were used to show that St. Hilaire's cellphone contained Hudson's

nickname, with an associated number, as an entry. The same is true for the piece of paper on

which the evidence was written. The trial court's instructions that the piece of paper was

introduced merely to show what was on the phone made this fact clear, and as discussed above,

the jury is presumed to have followed this instruction.

Even if the piece of paper were viewed as a statement, Hudson's Confrontation Clause claim is still infirm.  The Sixth Amendment provides, among other things, that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. Const. amend. VI.  In Crawford v. Washington, 541 U.S. 36 (2004), the Supreme Court made clear that the Confrontation Clause applies only to "testimonial" statements.  Id. at 68–69.  A testimonial statement is "a solemn declaration or affirmation made for the purpose of establishing or proving some fact."  Michigan v. Bryant, 131 S. Ct. 1143, 1153 (2011) (internal quotation marks and brackets omitted); accord Davis v. Washington, 547 U.S. 813, 822 (2006) (A testimonial statement is one whose "primary purpose is to establish or prove past events potentially relevant to later criminal prosecution").  Obviously, the entries in the cellphone do not fit this definition inasmuch as there is no possibility that when St. Hilaire entered these numbers into his phone, they were for the purpose of establishing or proving a fact.  Moreover, Crawford made clear that the constitutional bar does not apply where testimonial statements are used "for purposes other than establishing the truth of the matter asserted."  541 U.S. at 59 n. 9.  As just discussed, the entries were not offered for this purpose.

Additionally, as the Appellate Division held, this evidence was ultimately cumulative, because the information regarding the cell phone numbers was elicited orally from other witnesses.  Hudson, 90 A.D.3d at 438 ("[T]he contact entry was not prejudicial, because it was merely cumulative to other evidence showing a pattern of calls between the codefendant's phone and a phone that was sufficiently connected to defendant.").

IV.    CONCLUSION

For the foregoing reasons, Hudson's petition should be denied.

## PROCEDURE FOR FILING OBJECTIONS TO THIS
## REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil

Procedure, the parties have fourteen (14) days including weekends and holidays from service of

this Report and Recommendation to serve and file any objections.  See also Fed. R. Civ. P. 6(a),

(b), (d).  Such objections (and any responses to objections) shall be filed with the Clerk of the

Court, with copies sent to the Hon. Paul A. Crotty, and to the undersigned, at 500 Pearl Street,

New York, New York 10007.  Any request for an extension of time to file objections must be

directed to Judge Crotty.  If a party fails to file timely objections, that party will not be permitted

to raise any objections to this Report and Recommendation on appeal.  See Thomas v. Arn, 474

U.S. 140 (1985); Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd &

Carwile, P.C., 596 F.3d 84, 92 (2d Cir. 2010).

Dated: September 17, 2013
      New York, New York

              GABRIEL W. GORENSTEIN
              United States Magistrate Judge

23